MODIFIED OPINION[1]

IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 99,988

STATE OF KANSAS,
*Appellee*,

v.

SCOTT D. CHEEVER,
*Appellant.*


SYLLABUS BY THE COURT


1.

Defendants who testify on their own behalf open themselves not only to cross-examination but also to rebuttal testimony concerning both the substance of their testimony and their credibility.


2.

Retroactive application of K.S.A. 2013 Supp. 21-5402(d) excluding felony murder as a lesser included offense of capital murder in a capital case does not violate a capital defendant's due process rights or the constitutional prohibition against ex post facto laws.

---

[1]**REPORTER'S NOTE**:  Opinion No. 99,988 was modified by the Supreme Court on July 20, 2017, in response to defendant's motion for rehearing or modification filed August 12, 2016. The original opinion without the modification will not be published in the bound volumes of the Kansas Reports.

1

3.

Appellate issues and arguments supporting them must be advanced initially in a brief. A motion is an inappropriate vehicle to raise or argue an appellate issue for the first time.

4.

The Eighth Amendment to the United States Constitution does not require the district court to instruct a capital jury that mitigating circumstances need not be proved beyond a reasonable doubt.

5.

K.S.A. 21-4624(e) provides greater protection to a death-eligible defendant than required by the federal Constitution. In Kansas, a capital jury must be instructed that mitigating circumstances need not be proved beyond a reasonable doubt. Under the facts of this case and the applicable standard of review, the district court's failure to instruct the jury about the burden of proof on mitigators was not clearly erroneous.

6.

K.S.A. 2015 Supp. 21-6619(b) imposes a mandatory exception in death penalty appeals to various statutes, rules, and prudential practices barring consideration of unpreserved issues.

7.

A party cannot raise a challenge to the constitutionality of a statute if the claimed defect does not apply to that party.

8.

Standing is a component of the case-or-controversy limitation on judicial power under the doctrine of separation of powers.

9.

Because the Kansas Constitution's framework limits the judicial power to actual cases and controversies, Kansas courts do not have the power to give advisory opinions.

10.

To meet the case-or-controversy requirement, a party must have standing; the issue cannot be moot; the issue must be ripe; and the issue cannot present a political question.

11.

The standing requirement is a constitutional limitation on this court's power.

12.

Under the Sixth and Fourteenth Amendments to the United States Constitution, a defendant in a capital criminal case has a right to an impartial jury.

13.

A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the court's instructions require.

14.

The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views

3

would prevent or substantially impair the performance of his or her duties as a juror in accordance with the court's instructions and the juror's oath.

15.

It is the duty of a trial court to see that a jury of competent, fair, and impartial persons is impaneled.

16.

K.S.A. 22-3410(2)(i) provides that a prospective juror may be challenged for cause when his or her state of mind with reference to the case or parties prevents the juror from acting impartially and without prejudice to the substantial rights of any party.

17.

Because only the district court is in a position to view the demeanor of prospective jurors during voir dire, a district court's ruling on a challenge for cause will not be disturbed on appeal unless it is clearly erroneous or amounts to an abuse of discretion.

18.

When a defendant appeals a strike for cause of a panel member prompted by the prospective juror's opinion on the death penalty, the question before the appellate court is not whether it would have agreed with a district judge's decision but whether the district judge's decision is fairly supported by the record.

19.

An impartial jury consists of jurors who will conscientiously find the facts and apply the law.

4

20.

Section 7 of the Kansas Constitution Bill of Rights provides no greater protection than that provided by K.S.A. 43-156.

21.

Prospective jurors cannot be discriminated against on the basis of their religious belief or lack of belief, but they can be excluded from jury service when their belief or nonbelief makes it impossible for them to act impartially under the rule of law.

22.

The Eighth Amendment of the United States Constitution prohibits giving the jury misleading information that minimizes its role in the death penalty process.

23.

A trial court should avoid any mention of a defendant's right to appeal.

24.

Judicial comments that are not instructions to the jury are reviewed on appeal under judicial misconduct standards.

25.

In cases alleging judicial misconduct, the court's standard of review is unlimited. It must look to the particular facts and circumstances of the case. The question is whether the defendant's substantial rights to a fair trial were prejudiced by the district judge's statements. The defendant bears the burden of showing his or her substantial rights were prejudiced.

26.

Capital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment. A defendant's age of at least 18 years old at the time of the crime is a fact necessary to the defendant's eligibility for the death penalty in Kansas, and proof of that fact is therefore within the scope of protection provided under the Sixth Amendment to the United States Constitution.

27.

Harmless error analysis applies to error in omitting an element of a defendant's age from jury instructions.

28.

Under K.S.A. 21-4624(c), any evidence relevant to the question of sentence that the court deems to have probative value may be received, regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements.

29.

The standard of review and the ultimate question that must be answered with regard to whether prosecutorial misconduct in the penalty phase of a capital trial was harmless is whether the court is able to find beyond a reasonable doubt that the prosecutorial misconduct, viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion on the weight of aggravating and mitigating circumstances. The overwhelming nature of the evidence is a factor to be considered, although its impact is limited.

30.

When considering a claim that cumulative error infected the penalty-phase proceeding, this court must consider whether it is able to find that the total cumulative effect of the errors, viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. The degree of certainty by which this court must be persuaded turns on whether any of the errors infringe upon a right guaranteed by the United States Constitution. The overwhelming nature of the evidence is a factor to be considered, although its impact is limited. The question before this court is not what effect the cumulative error generally might be expected to have upon a reasonable jury but, rather, what effect it had upon the actual sentencing determination in the case on review.

31.

Although certain guilt-phase errors may not individually or collectively require reversal of a conviction, those errors may be so compelling that they affect a sentencing determination when the same jury has decided both guilt and sentence.

Appeal from Greenwood District Court; MICHAEL E. WARD, judge. Opinion on remand filed July 22, 2016. Modified opinion on remand filed July 20, 2017. Affirmed.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, argued the cause, and *Reid T. Nelson*, of the same office, was with her on the briefs for appellant.

*Stephen R. McAllister*, solicitor general, argued the cause, and *Kristafer R. Ailslieger*, deputy solicitor general, *Clay Britton*, assistant solicitor general, *Steve Six*, former attorney general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

*Stephen Douglas Bonney*, of ACLU Foundation of Kansas, of Kansas City, Missouri, and *Catherine M.A. Carroll* and *Albinas J. Prizgintas*, of Wilmer Cutler Pickering Hale and Dorr LLP, of

Washington, D.C., were on the brief for *amici curiae* American Civil Liberties Union and ACLU Foundation of Kansas.

The opinion of the court was delivered by

ROSEN, J.: This case comes before us after the United States Supreme Court vacated our decision in *State v. Cheever*, 295 Kan. 229, 284 P.3d 1007 (2012), *vacated and remanded* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013), and remanded for further proceedings.

In our decision, we had held that defendant Scott D. Cheever did not waive his privilege against self-incrimination under the Fifth Amendment to the United States Constitution by presenting a voluntary intoxication defense to the capital murder charges against him. 295 Kan. at 251. The United States Supreme Court disagreed and held that the rebuttal testimony presented by the State in the form of the expert opinion of Dr. Michael Welner was admissible. *Kansas v. Cheever*, 571 U.S. ___, 134 S. Ct. 596, 602, 187 L. Ed. 2d 519 (2013). As the Court noted, because we had ruled that Welner should not have been allowed to testify at all, we did not consider whether the testimony he gave exceeded the scope of rebuttal allowed by the Fifth Amendment or by Kansas evidentiary rules; and the Court did not address the issue. 134 S. Ct. at 603.

On remand, we asked the parties to address the scope-of-rebuttal issue. Briefs were received and arguments heard. After consideration, we hold that Welner's testimony, while questionable in form, did not, in substance, exceed the proper scope of rebuttal, either constitutionally or under state evidentiary rules. We further hold that none of the remaining issues raised on appeal require reversal or remand, and, accordingly, we affirm Cheever's convictions and sentences.

8

The facts of this case were set out at length in our earlier decision, *Cheever*, 295 Kan. at 235-40, and we therefore add facts only as necessary to our analysis of the issues.

Appellate proceedings in this case followed Cheever's conviction of one count of capital murder for the killing of Greenwood County Sheriff Matthew Samuels and four counts of attempted capital murder for firing at other law enforcement officers. Direct appeal to this court was automatic because the jury had sentenced Cheever to death on the capital offense. See K.S.A. 21-4627(a).

GUILT PHASE

*Proper Rebuttal Testimony*

Cheever's objections to the content of Welner's testimony revolve primarily around Welner's statement that Cheever emulated an outlaw lifestyle and his alleged implication that Cheever had an antisocial personality disorder. Taking as our standard both the guidance set out in the United States Supreme Court's decision and our own oft-stated rubric for reviewing challenges regarding the appropriate scope of rebuttal, see, *e.g.*, *State v. Sitlington*, 291 Kan. 458, 464, 241 P.3d 1003 (2010) (trial judge has broad discretion in determining use, extent of relevant evidence in rebuttal), we hold that the trial judge's admission of Welner's testimony was within the broad discretion granted him.

First, and significantly, our measure of the appropriate scope of rebuttal in this case must take into account not just the testimony presented by Cheever's expert on the topic of his methamphetamine intoxication, but also Cheever's own testimony concerning his past use of the drug and the events leading to and constituting the crimes. Much of

Welner's testimony concerning details of the crimes, and Cheever's actions constituting them, was responsive to Cheever's own testimony. Having taken the stand, Cheever opened himself to rebuttal testimony just as he opened himself to cross-examination concerning both the substance of his testimony and his credibility as a witness. *Cheever*, 134 S. Ct. at 601.

But concluding that Welner's testimony was responsive in and of itself does not insulate the testimony from appellate scrutiny if the testimony was otherwise inadmissible. *Cf. State v. Everett*, 296 Kan. 1039, 1045, 297 P.3d 292 (2013) (evidence admitted in rebuttal to other evidence under an "'open the door'" rule is not an exception permitting evidence of other crimes or civil wrongs to be admitted independent of K.S.A. 60-455); *State v. Cosby*, 285 Kan. 230, 248-49, 169 P.3d 1128 (2007) (K.S.A. 60-447[b] applies to rebuttal evidence). Generally, a defendant does not put his or her character "truly in issue" simply by asserting an intoxication defense. *State v. Bowers*, 218 Kan. 736, 737, 545 P.2d 303 (1976); *cf. State v. Mader*, 261 Kan. 280, 283, 931 P.2d 1247 (1997) (when defendant relies upon self-defense, his or her attempt to prove victim was aggressor does not, standing alone, place character of victim in issue). And K.S.A. 60-447(b)(ii) provides that "evidence of a trait of an accused's character[,] . . . if offered by the prosecution to prove guilt, *may be admitted only after the accused has introduced evidence of his or her good character*." (Emphasis added.)

Characterizing portions of Welner's testimony as bad character evidence, Cheever argues that the testimony was inadmissible under K.S.A. 60-447(b)(ii) because he never introduced any evidence of his good character. The State appears to concede that Cheever did not introduce evidence of his good character, but it responds that Cheever "opened the door" to the complained-of testimony. The State asserts that Cheever and his expert both testified on the same or similar points addressed by Welner.

10

We believe the State was too hasty in conceding that Cheever did not introduce evidence of his good character. If he did so, the State's defense of this point with its open-the-door argument is unnecessary. In our view, Cheever downplays his own direct testimony unconvincingly. During direct, Cheever discussed two letters that he wrote shortly after the shooting death of Samuels. In the letters, which the State admitted without objection during its case-in-chief and to which Cheever continues to have no objection on appeal, Cheever wrote to two individuals—Nathan Fife and Crystal Mackey. The bulk of each letter is braggadocio, in which Cheever tells a glorified version of the circumstances surrounding the shooting and his arrest. The letters include multiple damning admissions. He admits that he intentionally waited hours for "the cops" to arrive and that he "blew [Samuels] back down the stairs" with a .44 Magnum pistol. In the course of these recitations, Cheever makes fleeting reference to being an "outlaw until they bury me" and to his willingness to "do it again in a heartbeat."

In Cheever's letter to Fife, he bragged:

"What's up my boy? Yeah I fucked up big time! It was fucking intense though. I'd do it again in a heartbeat. . . . I had a Super Blackhawk [.]44 mag and a [.]22 competition target pistol! . . . They shot 4 teargas things in there and that wasn't shit so they came piling in. I blew the first one back down the stairs, and the second one but that was all the [.]44 shells I had left on me . . . . I'm pretty much fucked! Fuck 'em, I'm still an outlaw until they bury me.

". . . Slates out there being a straight bitch. I was going to burn him [and] Carol out of Virgil but I had to shoot the sheriff instead!"

To Mackey, Cheever wrote:

"Anyways, [Billy] tried to get a front and call the cops (or get the cops called) thinking I'd just roll over and take it. I seen that shit coming for 5 hrs!!! But I said fuck

11

it . . . gonna have to shoot me. Pussies couldn't aim too good though so here I am! Stuck like Chuck! Damn it was intense Mackey. . . .

". . . And they wonder why a fucking young crankster gangster tends to snap every once in a while."

The State authenticated the letters through Fife and Mackey and introduced the letters without further embellishment.

Once Cheever was on the stand, during his direct examination, the following exchange occurred between him and his lawyer:

"[Defense counsel]:  This letter to Fife, Scott, it's a horrible letter.

"[Cheever]:  Yeah.

"[Defense counsel]:  You see that now?

"[Cheever]:  Yeah. (Nods head.)

"[Defense counsel]:  The person that wrote this letter I think could be accurately termed a monster.

"[Cheever]:  Yeah.

"[Defense counsel]:  Would you disagree with that?

"[Cheever]:  I seen it then, too. I mean, I was even told by my attorneys at that time, I think even you told me back then, 'Don't be writing no letters, don't be doing anything.' And I just, I mean, at that time, I mean, I was at the bottom. I mean, I'm not thinking about any of that. I don't even care, I mean, what the repercussions would be. I'm just trying to show off for my buddy, you know, I mean.

12

"[Defense counsel]: You don't even care what? I didn't hear that.

"[Cheever]: About anything. I'm not thinking about how any of the Samuels feel, I'm not thinking about my family, I'm not thinking about myself. It's just crazy, crazy time.

"[Defense counsel]: The letter to Crystal?

"[Cheever]: Yeah, same deal.

"[Defense counsel]: Not much better.

"[Cheever]: No, just putting on that persona, playing that role. I mean—

"[Defense counsel]: What role?

"[Cheever]: Just how everybody in that area is, I mean, in that type of community just everybody's drug addicts, and just—just I don't know, showing off for 'em, I guess.

"[Defense counsel]: Are you sorry you wrote those letters now?

"[Cheever]: Yeah. Basically yeah. (Nods head.)

"[Defense counsel]: 'Cause they make you look bad?

"[Cheever]: No. Just it's bad, I mean, the whole dialogue—

"[Defense counsel]: Sorry that somebody found 'em and you got caught?

"[Cheever]: No. I mean, just for my family, for the Samuels family, just the whole deal. They look at that person, and I don't know, it's real hard to hate that person—

or real easy to hate that person. And just it's not good to be like that, I mean, I can't really explain it.

. . . .

"[Defense counsel]: The letter that you wrote to Fife, you don't seem sorry as to what's happened to Sheriff Samuels, you don't seem sorry—

"[Cheever]: No.

"[Defense counsel]: —for killing him in that letter. Is that accurate?

"[Cheever]: No.

"[Defense counsel]: You didn't seem sorry?

"[Cheever]: At that time, no, I didn't even think about it. I wasn't thinking about nothing, except—

"[Defense counsel]: You don't seem very broken up in the letter to Mackey?

"[Cheever]: No.

"[Defense counsel]: To Crystal?

"[Cheever]: (Shaking head.)

"[Defense counsel]: Are you sorry now?

"[Cheever]: Yeah. (Nods head.) Extremely sorry.

"[Defense counsel]: What's changed?

14

"[Cheever]: Just it takes awhile. I mean, when you're at that point, like I said, you're down as well, clear at the rock bottom. I was probably as low as you could get almost. And you're not looking up here (indicating), you know, where everybody else is at. You're not even, I don't know—don't care about nothing, I mean. Absolutely no hope whatsoever, and just—at some point, I mean, it gets a little bit better, you start to come out of it, you know, the drugs wear off, your mind goes back, you kind of get into a routine in jail, and just things happen. I mean, you get to looking at life and grew up a little bit, and years go on, and changes."

Through his testimony, Cheever effectively commented on his own opinion of his character at the time of the murder and later. Cheever disavowed his earlier outlaw persona. Moreover, Cheever stated that he was simply "putting on that persona" and "showing off." Cheever clearly attempted to cast in a different light statements he had made in the letters. In effect, Cheever's statement to the jury was that, but for the methamphetamine, he was a person of good character. Cheever also addressed his apparent lack of remorse and how he had changed.

At a minimum, Cheever commented on his bad character at the time of the murder, *i.e.*, his outlaw persona and lack of remorse, and contrasted it with his later reformation into a more sensitive, and certainly remorseful, individual. Accordingly, the State was permitted to follow up on those same points with Cheever during cross-examination and with Welner during rebuttal, and K.S.A. 60-447(b)(ii) was no bar. It would be unfair to permit Cheever to testify about his bad character at the time of the murder and to attribute it to his methamphetamine use while refusing to allow the State to explore that testimony with Cheever and rebut it with expert testimony. The prosecutor fairly questioned Cheever during cross-examination about the outlaw persona he had essentially disavowed on direct examination. And with Cheever's character evidence before the jury, Welner could connect to that same character evidence and reasonable inferences to be drawn from Cheever's conduct as part of rebuttal testimony.

15

That said, we also observe that Welner's use of the first-person narrative to recount the crimes from Cheever's point of view in order to demonstrate Welner's conclusions about Cheever's mental abilities during the crimes was susceptible to an interpretation by the jury that would have been beyond the scope of appropriate testimony by Welner. Welner could have described Cheever's actions in the third person and then stated his own conclusions about what those actions indicated about Cheever's mental processes. We conclude that was the information he intended to relay. But by describing Cheever's actions and thoughts as though Cheever himself were relating them, he implied that he knew what Cheever was actually thinking as the events unfolded, a fact for which there was inadequate supporting evidence. While we are confident the jury was not misled by Welner's form of communication, that may not be so under a different set of facts and circumstances, and we discourage the use of the first-person narrative form in future cases.

Finally, we acknowledge that Welner never testified explicitly that he had diagnosed Cheever with antisocial personality disorder. As a consequence, we need not express an opinion on the use of alternative diagnoses as rebuttal evidence to mental status defenses.

Having concluded that Welner's testimony does not provide a basis for reversing the capital murder and attempted capital murder convictions in this case, we turn to the issues remaining in his appeal.

*Felony-Murder Instruction*

In response to Cheever's argument that the trial court should have instructed the jury that felony murder was a lesser included offense of capital murder, we held in our

16

earlier decision in this case that felony murder was a lesser included offense of capital murder and that such instruction must be given when the evidence warrants it. *Cheever*, 295 Kan. at 259. Following that decision, the Kansas Legislature adopted an amendment to K.S.A. 2012 Supp. 21-5402 by which it declared that felony murder was not a lesser included offense of capital murder. K.S.A. 2013 Supp. 21-5402(d). In *State v. Gleason,* 299 Kan. 1127, 1160-61, 329 P.3d 1102 (2014), *rev'd and remanded sub nom. Kansas v. Carr,* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016), we held the retroactive application of the amendment to cases pending at the time of its adoption did not offend due process or violate the prohibition against ex post facto laws of the United States Constitution. See also *State v. Carr*, 300 Kan. 1, Syl. ¶ 31, 331 P.3d 544 (2014), *rev'd and remanded* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016) (ruling in *Gleason* eliminates any need to address argument that a lesser included offense instruction for felony murder was supported by the evidence admitted at trial); *State v. Carr*, 300 Kan. 340, Syl. ¶ 32, 329 P.3d 1195 (2014) (same), *rev'd and remanded* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). The reasoning of the *Gleason* and *Carr* cases applies with equal force and effect to this case and requires us to conclude that Cheever was not entitled to a felony-murder lesser included offense instruction. The trial judge did not err when he did not give one.

PENALTY PHASE

In his original appellate brief, Cheever also raised several issues with respect to the penalty phase of his trial. We decided some of those issues and provided guidance on others in our prior decision. See *Cheever*, 295 Kan. at 259-73. Cheever continues to press issues left undecided in our earlier decision, and we discuss those issues now.

*Mitigating Circumstances Instructions*

In order to fully address Cheever's challenge to the mitigating circumstances instructions, it is necessary to walk through some of the procedural history of this case and inspect the issues and arguments raised. We begin with the issue and argument contained in Cheever's original brief.

In his original brief filed with this court in 2010, Cheever argued that the mitigating circumstances instructions used in his case "prevented the jury from properly considering and giving effect to mitigating circumstances, in violation of [his] rights under the Eighth and Fourteenth Amendments to the United States Constitution." Cheever asserted that the instructions failed to inform the jury that mitigating circumstances need not be proven beyond a reasonable doubt, and thus there existed a reasonable likelihood that a juror may have failed to consider mitigating circumstances as part of the sentencing decision. Throughout his argument, Cheever relied on the Eighth and Fourteenth Amendments to the United States Constitution and United States Supreme Court caselaw interpreting those amendments. He cited *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001), *cert denied* 537 U.S. 834 (2002), and *State v. Scott*, 286 Kan. 54, 183 P.3d 801 (2008), only as cases that are "[c]onsistent with [United States Supreme Court] decisions" interpreting the Eighth and Fourteenth Amendments.

In our 2012 decision, we did not reach the merits of this issue because we had reversed and remanded for a new trial on other grounds. See *Cheever*, 295 Kan. at 233, 265-66. We did, however, direct the trial court to use the most current version of PIK Crim. 3d 56.00-D (2008 Supp.) in any retrial. That PIK provision included language telling the jury that mitigating circumstances need not be proven beyond a reasonable doubt. See 295 Kan. at 266.

In 2014, we decided the same issue Cheever raised in his original brief in three other cases. In each case, we concluded that the failure of the district court to instruct the

18

jury that mitigating circumstances need not be proven beyond a reasonable doubt required vacating each appellant's death sentence under the Eighth Amendment. *Carr*, 300 Kan. at 369-70; *Carr*, 300 Kan. at 303; *Gleason*, 299 Kan. at 1197. After the State filed a petition for writ of certiorari in each case and those petitions were granted, we—with the consent of both Cheever and the State—stayed the proceedings in this case pending disposition of the three cases by the United States Supreme Court. That resolution came in January 2016 when the Court issued *Kansas v. Carr*, 577 U.S. __, 136 S. Ct. 633, 642-44, 193 L. Ed. 2d 535 (2016), and vacated this court's judgment with respect to the need for a burden-of-proof instruction on mitigating circumstances under the Eighth Amendment. In February 2016, we lifted the stay in this case.

Six days after the stay was lifted, Cheever filed a Motion for Determination that Instructional Error Requires Reversal of [his] Sentence of Death on State Law Grounds. In his motion, Cheever sought the following relief:

> "- Hold that Kansas law requires that the trial court instruct a penalty phase jury in a capital case that a mitigating circumstance need not be proved beyond a reasonable doubt in order to be considered in the weighing process, and

> "- Hold that the trial court's failure, in this case, to give that instruction requires reversal of [his] sentence of death because the instructions, when considered as a whole, created a reasonable likelihood that the jurors applied a beyond a reasonable doubt standard to his proffered mitigation evidence, contrary to Kansas law."

After receiving an extension of time to respond, the State filed a response in which it argued that Cheever had waived any state law argument by not raising it in his original brief. Cheever filed a reply several days later, asserting that he had not waived any argument rooted in state law. According to Cheever, he had presented a state law argument in his original brief when he argued that reversal was required under *Kleypas*.

19

We disagree with Cheever on this point. Cheever's claim in his 2010 brief relied exclusively on the Eighth and Fourteenth Amendments, stating only that *Kleypas* and *Scott* were in line with precedent developed in other courts. He did not argue that *Kleypas* set up an independent state law framework to support his claim.

Turning to the propriety of raising a new issue in a motion, we look first to our Rules of Appellate Practice.

Appellate motions are governed by Supreme Court Rule 5.01 (2015 Kan. Ct. R. Annot. 34). A motion must be limited to a single subject and "must state with particularity the ground for the motion and the relief or order sought." Rule 5.01(a). A party may serve and file a response within 7 days after being served with a motion. Rule 5.01(c). There is no rule permitting a reply to a response to a motion.

Rules 6.01 through 6.10 (2015 Kan. Ct. R. Annot. 40-59) pertain to appellate briefs. See Rule 6.01(b) (2015 Kan. Ct. R. Annot. 40) (brief filing schedule); 6.02 (2015 Kan. Ct. R. Annot. 41) (content of appellant's brief); 6.05 (2015 Kan. Ct. R. Annot. 49) (reply brief). Rule 6.09(b) (2015 Kan. Ct. R. Annot. 53) sets forth the procedure by which a party may inform the court by letter of additional persuasive or controlling authority that has some bearing on an issue or issues raised in a brief.

The rules governing appellate motions and briefs operate together when a party wishes to raise a new issue not contained in the original appellate brief. See *State v. Molina*, 299 Kan. 651, 664, 325 P.3d 1142 (2014) (granting defendant's motion to file supplemental brief raising new issue); see also *State v. Tague*, 296 Kan. 993, 1011, 298 P.3d 273 (2013) (motion to file supplemental brief submitted after oral argument not

timely); *cf. Gleason*, 299 Kan. at 1156 (granting State's motion to file supplemental brief addressing legislative amendments).

We have held that appellate counsel must set forth all arguments within a brief. *Ferguson v. State*, 276 Kan. 428, 449-50, 78 P.3d 40 (2003) (citing Rule 6.02 and Rule 6.03). By extension, all issues must also be contained within the briefs. See *State v. Nece*, 303 Kan. 888, 897, 367 P.3d 1260 (2016) (argument not briefed deemed waived and abandoned); *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013) (issue not briefed by appellant deemed waived and abandoned); *State v. Greever*, 286 Kan. 124, 131-32, 183 P.3d 788 (2008) (recognizing exception; "if the issue is raised on remand, it is preserved on *further* appeal"); *cf. State v. Littlejohn*, 298 Kan. 632, Syl. ¶ 8, 316 P.3d 136 (2014) (appellate courts will not consider new issues raised for first time in Rule 6.09[b] letter). But see *State v. Ford*, 302 Kan. 455, 463, 353 P.3d 1143 (2015) (court may correct illegal sentence at any time; subject matter jurisdiction may be raised at any time).

These authorities demonstrate that Cheever has chosen the wrong procedural vehicle to obtain his requested relief. A motion cannot be used as an end run around our rules of appellate procedure. We deny Cheever's motion.

This decision does not, however, end our consideration of the merits of the issue Cheever attempts to raise for the first time in his motion. Because this is a death penalty case, K.S.A. 2015 Supp. 21-6619 applies. Under K.S.A. 2015 Supp. 21-6619(a), any case in which a defendant is convicted and sentenced to death is "subject to automatic review by and appeal to the supreme court of Kansas in the manner provided by the applicable statutes and rules of the supreme court governing appellate procedure." In addition, K.S.A. 2015 Supp. 21-6619(b) states that we "shall consider the question of sentence as well as any errors *asserted* in the review and appeal and shall be authorized to notice

*unassigned* errors appearing of record if the ends of justice would be served thereby." (Emphasis added.) And this court is "authorized to enter such orders as are necessary to effect a proper and complete disposition of the review and appeal." K.S.A. 2015 Supp. 21-6619(d). We have recognized this statutory authorization not only to identify error, but also to lay to rest whether error occurred at all. See *Carr*, 300 Kan. at 44-49 (under authority of K.S.A. 2013 Supp. 21-6619[b] analyzing "unassigned potential errors" and concluding no error occurred). In addition, Cheever's failure to comply with our rules is not an absolute procedural bar to our reaching the issue because doing so serves the "ends of justice." C*f. State v. Adams*, 283 Kan. 365, 367, 153 P.3d 512 (2007) (appellate court has power to address unraised issues in exceptional circumstances, where consideration of issue necessary to serve ends of justice or prevent denial of fundamental rights). Under the unique circumstances of this case and in the interest of judicial economy, we elect to reach the issue raised in Cheever's motion.

Having disposed of procedural obstacles to our consideration of the merits of the mitigating circumstances instructions issue, we move to substance. And, before addressing the state law basis for relief relied upon in Cheever's motion, we address his original claim rooted in the Eighth Amendment.

In *Kansas v. Carr*, the United States Supreme Court rejected this court's "conclusion that the Eighth Amendment requires capital-sentencing courts in Kansas 'to affirmatively inform the jury that mitigating circumstances need not be proven beyond a reasonable doubt.'" 136 S. Ct. at 642 (quoting *Gleason*, 299 Kan. at 1197). The Court also rejected any notion that "even if an instruction that mitigating evidence need not be 'proven beyond a reasonable doubt' is not always required, it was constitutionally necessary in *these* cases to avoid confusion." *Kansas v. Carr*, 136 S. Ct. at 642. Noting that constitutional error occurs with respect to capital-sentencing instructions only if there is a "'*reasonable likelihood* that the jury has applied the challenged instruction in a way

22

that prevents the consideration of constitutionally relevant evidence,'" the Court concluded that the "alleged confusion stemming from the jury instructions used at the defendants' sentencings does not clear that bar." 136 S. Ct. at 642-43 ("A meager 'possibility' of confusion is not enough."). The Court explained:

"As an initial matter, the defendants' argument rests on the assumption that it would be unconstitutional to require the defense to prove mitigating circumstances beyond a reasonable doubt. Assuming without deciding that that is the case, the record belies the defendants' contention that the instructions caused jurors to apply that standard of proof. The defendants focus upon the following instruction: 'The State has the burden to prove beyond a reasonable doubt that there are one or more aggravating circumstances and that they are not outweighed by any mitigating circumstances found to exist.' [Citation omitted.] The juxtaposition of aggravating and mitigating circumstances, so goes the argument, caused the jury to speculate that mitigating circumstances must also be proved beyond a reasonable doubt. [Citation omitted.] It seems to us quite the opposite. The instruction makes clear that both the existence of aggravating circumstances and the conclusion that they outweigh mitigating circumstances must be proved beyond a reasonable doubt; mitigating circumstances themselves, on the other hand, must merely be 'found to exist.' That same description, mitigating circumstances '*found to exist*,' is contained in three other instructions, App. to Pet. for Cert. in No. 14-452, at 133 (Instrs. 7, 9, and 10) (emphasis added)—unsurprisingly, since it recites the Kansas statute, see Kan. Stat. Ann. § 21-4624(e) (1995). 'Found to exist' certainly does not suggest proof beyond a reasonable doubt. The instructions as a whole distinguish clearly between aggravating and mitigating circumstances: '*The State* has the burden to prove beyond a reasonable doubt that there are one or more aggravating circumstances . . . ,' and the jury must decide unanimously that the State met that burden. App. to Pet. for Cert. in No. 14-452, at 133 (Instrs. 8 and 10) (emphasis added). 'Mitigating circumstances,' on the other hand, 'do not need to be found by all members of the jury' to 'be considered by an individual juror in arriving at his or her sentencing decision.' *Id*., at 131 (Instr. 7). Not once do the instructions say that defense counsel bears the burden of proving the facts constituting a mitigating circumstance beyond a reasonable doubt—nor

23

would that make much sense, since one of the mitigating circumstances is (curiously) 'mercy,' which simply is not a factual determination.

"We reject the Kansas Supreme Court's decision that jurors were 'left to speculate as to the correct burden of proof for mitigating circumstances.' [Citation omitted.] For the reasons we have described, no juror would reasonably have speculated that mitigating circumstances must be proved by any particular standard, let alone beyond a reasonable doubt. The reality is that jurors do not 'pars[e] instructions for subtle shades of meaning in the same way that lawyers might.' [Citation omitted.] The instructions repeatedly told the jurors to consider *any* mitigating factor, meaning any aspect of the defendants' background or the circumstances of their offense. Jurors would not have misunderstood these instructions to prevent their consideration of constitutionally relevant evidence." *Kansas v. Carr*, 136 S. Ct. at 643-44.

The mitigating circumstances instructions at issue in *Kansas v. Carr* are not meaningfully distinguishable from those used during Cheever's penalty-phase proceeding. Accordingly, the decision in *Kansas v. Carr* forecloses any relief under the Eighth Amendment for Cheever.

We now turn to the state law issue Cheever raised in his motion. Notwithstanding the United States Supreme Court's decision in *Kansas v. Carr*, Cheever contends that *Gleason*, 299 Kan. 1127, relied on state law and merely "reflected Eighth Amendment concerns." According to Cheever, the *Gleason* decision "was rooted in the unique provisions of Kansas law" and was ultimately based on state statutory law, specifically K.S.A. 21-4624(e). But see *Kansas v. Carr*, 136 S. Ct. at 641 (*Gleason* decision "leaves no room for doubt that it was relying on the Federal Constitution").

K.S.A. 21-4624(e) provides:

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced to life without the possibility of parole. The jury, if its verdict is a unanimous recommendation of a sentence of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstances which it found beyond a reasonable doubt. If, after a reasonable time for deliberation, the jury is unable to reach a verdict, the judge shall dismiss the jury and impose a sentence of life without the possibility of parole and shall commit the defendant to the custody of the secretary of corrections."

In *Gleason*, we explained:

"Because K.S.A. 21-4624 expressly burdens the State with proving the existence of aggravating circumstances beyond a reasonable doubt but places no evidentiary burden regarding the existence of mitigating circumstances on the defendant beyond the burden of production, we reiterate our holding in *Kleypas* and *Scott* that capital juries in Kansas must be informed that mitigating circumstances need not be proven beyond a reasonable doubt. Because the instruction given in this case failed to do so, it was erroneous." *Gleason*, 299 Kan. at 1196-97.

Cheever relies on this passage and its citation to K.S.A. 21-4624 as support for his position that *Gleason*, *Scott*, and *Kleypas* demonstrate the existence of a state law framework for considering a claim of this particular instructional error, one independent of the Eighth Amendment basis that has now been rejected in *Kansas v. Carr*.

In *Kleypas*, this court considered whether the penalty-phase instructions prevented the jury from considering mitigating circumstances. Specifically, the defendant argued that the instructions improperly directed the jury that it had to be unanimous in a finding of mitigating circumstances. *Kleypas*' citation to and discussion of United States Supreme

25

Court cases indicate that the Eighth and Fourteenth Amendments were understood to govern the unanimity instruction claim. See 272 Kan. at 1076-77 (citing *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 [1988]; *McKoy v. North Carolina*, 494 U.S. 433, 443-44, 110 S. Ct. 1227, 108 L. Ed. 2d 369 [1990] [unconstitutional to require mitigating circumstance to be found unanimously]).

On the way to resolving the issue, the *Kleypas* court identified two components that should be included in any instruction addressing mitigating circumstances:

> "[A]ny instruction dealing with the consideration of mitigating circumstances should state (1) they need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision *and not beyond a reasonable doubt* and (2) mitigating circumstances do not need to be found by all members of the jury in order to be considered in an individual juror's sentencing decision." (Emphasis added.) *Kleypas*, 272 Kan. at 1078.

The italicized language referring to the burden of proof on mitigators went beyond the issue actually before the court. The challenged instruction provided in relevant part: "'It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment.'" 272 Kan. at 1077. And the *Kleypas* court ultimately approved that portion of the instruction because it "was sufficient to address the concern that the jury might believe that unanimity was required as to mitigating circumstances." 272 Kan. at 1079.

In *Scott*, this court again dealt with the issue of juror unanimity as to mitigating circumstances. Although the *Scott* court did not explicitly state that it was considering the claim under the Eighth and Fourteenth Amendments, the court's citation to *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990), for the appropriate standard of review again indicated that the issue was considered under the

26

framework of the federal Constitution. See *Scott*, 286 Kan. at 104-05 (standard of review of claim that jury instruction in penalty phase prevented jury from giving proper consideration to mitigating evidence is whether there is a reasonable likelihood that jury applied challenged instruction in a way that prevents consideration of constitutionally relevant evidence).

Recognizing that it had addressed the same issue in *Kleypas*, the *Scott* court noted that *Kleypas* recommended the two components that should be included in any mitigating circumstances instruction. *Scott*, 286 Kan. at 106-07. The *Scott* court then distinguished *Kleypas* on the basis that the unanimity language included in the instruction in *Kleypas* and approved by the court had not been included in *Scott*. It explained:

> "In addition to the instructions we have emphasized, we have considered all of the other instructions given by the trial court in an effort to decide whether jurors could have reasonably been misled to believe unanimity was required as to mitigating circumstances. Read together, the instructions repeatedly emphasize the need for unanimity as to any aggravating circumstances found to exist. Conversely, the trial court's instructions do not inform the jury as to a contrary standard for determining mitigating circumstances. The jury is left to speculate as to the correct standard. Under these circumstances, we conclude there is a substantial probability reasonable jurors could have believed unanimity was required to find mitigating circumstances. We hold failure of the trial court to provide the jury with a proper standard for determining mitigating circumstances constitutes reversible error. See *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988) (holding a death sentence should be vacated where there was a substantial probability reasonable jurors may have thought they could only consider those mitigating circumstances unanimously found to exist). Accordingly, we must reverse the death sentence and remand to the district court for a new capital sentencing hearing." *State v. Scott*, 286 Kan. 54, 107, 183 P.3d 801 (2008).

In *Gleason*, the defense challenge to the mitigating circumstances jury instructions shifted focus from juror unanimity to burden of proof. The defendant argued that the district court erred when it failed to instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt. Further, the error required reversal because "the instructions as a whole exacerbated the error and there is a reasonable likelihood the jurors were precluded from considering relevant mitigating evidence in violation of the Eighth and Fourteenth Amendments to the United States Constitution." *State v. Gleason*, 299 Kan. 1127, 1191, 329 P.3d 1102 (2014).

The *Gleason* court quoted *Scott* and *Boyde* for the proper standard of review. And then it discussed *Kleypas*, *Scott*, and the evolution of the PIK instruction on mitigating circumstances. *Gleason*, 299 Kan. at 1191-94.

The court described the two components identified in *Kleypas* as "required content of penalty-phase mitigating circumstances instructions." *Gleason*, 299 Kan. at 1195. And, although *Kleypas* and *Scott* had dealt with juror unanimity, *i.e.*, the second component identified in *Kleypas*, we characterized both components as "implicat[ing] the broader Eighth Amendment principle prohibiting barriers that preclude a sentencer's consideration of all relevant mitigating evidence." *Gleason*, 299 Kan. at 1195. Still, we said:

> "[T]he United States Supreme Court has explained that its Eighth Amendment jurisprudence on capital sentencing should not be interpreted as creating any constitutional requirements as to how or whether a capital jury should be instructed on the burden of proof for mitigating circumstances. [Citation omitted.] . . . 'So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove . . . aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.'" *Gleason*, 299 Kan. at 1195 (quoting *Walton v. Arizona*, 497 U.S.

28

639, 650, 110 S. Ct. 3047, 111 L. Ed. 2d 511 [1990], *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 [2002]).

The court nevertheless took pains to distinguish the Arizona statute at issue in the quoted *Walton* case from K.S.A. 21-4624:

"[T]he capital sentencing statute at issue in *Walton* explicitly required defendants to prove mitigating circumstances by a 'preponderance of the evidence' standard. 497 U.S. at 651. Kansas' capital sentencing statute differs distinctly from the statute at issue in *Walton*, and that distinction is critical to our analysis here. Namely, while K.S.A. 21-4624 requires the State to prove aggravating circumstances beyond a reasonable doubt, the statute is silent as to any burden of proof for mitigating circumstances. K.S.A. 21-4624(e); see also *Marsh*, 548 U.S. at 173 (contrasting Kansas' statute, which places no evidentiary burden on capital defendants, with Arizona's statute, which requires capital defendants to prove mitigating circumstances by a preponderance of the evidence).

"As the United States Supreme Court recognized, '[t]his distinction operates in favor of Kansas capital defendants.' 548 U.S. at 173. Notably, *Kleypas*' first statement— that any mitigating circumstance instruction must inform the jury that mitigating instructions 'need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt,' both preserves the statute's favorable distinction and protects a capital defendant's Eighth Amendment right to individualized sentencing by ensuring jurors are not precluded from considering all relevant mitigating evidence. *Kleypas*, 272 Kan. at 1078.

"In conclusion, both *Kleypas* and *Scott* support Gleason's claim that the trial court here erroneously instructed the jury regarding mitigating circumstances. Here, the instruction failed to affirmatively inform the jury that mitigating circumstances need only be proved to the satisfaction of the individual juror in that juror's sentencing decision and not beyond a reasonable doubt. See *Kleypas*, 272 Kan. at 1078." *Gleason*, 299 Kan. at 1195-96.

Our *Gleason* decision then discussed the relationship between K.S.A. 21-4624 and the language regarding mitigating circumstances instructions found in *Kleypas* and *Scott*:

> "Because K.S.A. 21-4624 expressly burdens the State with proving the existence of aggravating circumstances beyond a reasonable doubt but places no evidentiary burden regarding the existence of mitigating circumstances on the defendant beyond the burden of production, we reiterate our holding in *Kleypas* and *Scott* that capital juries in Kansas must be informed that mitigating circumstances need not be proven beyond a reasonable doubt. Because the instruction given in this case failed to do so, it was erroneous." *Gleason*, 299 Kan. at 1196-97.

Ultimately, the *Gleason* court agreed with the defense that the district court's error was exacerbated when the instructions were considered as a whole and that the error required vacating the death sentence because a "reasonable likelihood exist[ed] that the jury applied the mitigating circumstances instruction in a manner precluding individual jurors from properly considering relevant mitigating evidence as required by the Eighth Amendment." *Gleason*, 299 Kan. at 1197.

We conclude from this review that in *Kleypas*, *Scott*, and *Gleason* the burden of proof instruction issues were framed as federal constitutional claims. But central to the decision in each case was this court's consideration of K.S.A. 21-4624(e). See, *e.g.*, *Gleason*, 299 Kan. at 1196-97. And K.S.A. 21-4624(e) provides greater protection to a death-eligible defendant than that required by the federal Constitution, *i.e.*, the defendant has only a burden of production in establishing mitigating circumstances. Compare *Gleason*, 299 Kan. at 1196-97 (K.S.A. 21-4624 expressly burdens State with proving aggravating circumstances beyond reasonable doubt but places no evidentiary burden regarding existence of mitigating circumstances on defendant beyond burden of production), with *Walton*, 497 U.S. at 650 (defendant's constitutional rights not violated by imposing burden to prove mitigating circumstances by preponderance of evidence).

30

See generally *Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 648, 193 L. Ed. 2d 535 (2016) (Sotomayor, J., dissenting) ("The Federal Constitution guarantees only a minimum slate of protections; States can and do provide individual rights above that constitutional floor."). In enacting K.S.A. 21-4624(e), the Kansas Legislature endowed capital defendants with protection above that of the federal constitutional floor with respect to the burden of proof to establish mitigating circumstances. This greater protection is a matter of state law outside the purview of the United States Supreme Court.

Cheever did not object at trial to the giving of the mitigating circumstances instruction or request an affirmative instruction about the burden of proof with respect to mitigating circumstances. Thus we review this state law challenge for clear error. See K.S.A. 22-3414(3) (no party who fails to object in district court may assign as error the giving or failure to give an instruction unless instruction or failure to give instruction clearly erroneous); *State v. Robinson*, 303 Kan. 11, 282, 363 P.3d 875 (2015).

In contexts outside the penalty phase of a capital murder proceeding, we have explained that an appellate court follows a multi-step process when analyzing jury instruction issues:

> "(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;
> (2) considering the merits of the claim to determine whether error occurred below; and
> (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless." *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

We have also recognized that the first and third steps "are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step." *State v. Bolze-Sann*, 302 Kan. 198, 209, 352 P.3d 511 (2015). And to

determine whether it was clearly erroneous to give or fail to give an instruction, *i.e.*, a reviewability threshold, "the reviewing court necessarily has to first determine whether it was erroneous at all." *State v. Haberlein*, 296 Kan. 195, 203, 290 P.3d 640 (2012). Thus, we have occasionally described our analysis as a "two-part test" when determining whether the giving or failing to give a jury instruction is clearly erroneous. See *Robinson*, 303 Kan. at 282.

> "'First, "the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record."' *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013) (quoting *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 [2012]).

> "If error is found, we next conduct a reversibility inquiry, where

> "'"the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *Williams*, 295 Kan. 506, Syl. ¶ 5.' *Herbel*, 296 Kan. at 1121." *Robinson*, 303 Kan. at 282.

We begin by asking whether an instruction on the burden of proof for mitigating circumstances was legally appropriate.

As noted above, K.S.A. 21-4624(e) provides greater protection to a death-eligible defendant than that required by the federal Constitution. By necessary implication, it evidences the legislature's intent that a capital penalty phase jury be instructed that mitigating circumstances need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt. Thus the instruction for which Cheever argues on appeal was legally appropriate.

Moreover, because mitigating circumstances must be determined by each juror individually and because mercy itself may be considered a mitigating factor, the challenged instruction also was factually appropriate in the sentencing phase of this capital proceeding. See *State v. Carr*, 300 Kan. 1, 307, 331 P.3d 544 (2014) (recognizing mercy as mitigating factor).

In *State v. Kleypas*, 272 Kan. 894, 1078, 40 P.3d 139 (2001), this court recognized the same construction of K.S.A. 21-4624(e) as we articulate today. Although that recognition qualified as judicial dicta because the burden-of-proof issue was not before the court in that case, this court nevertheless correctly identified the required content of a mitigating circumstances instruction under state law, and that law has controlled since 2001. This court has repeated the burden-of-proof requirement; district court judges have relied on it in formulating their instructions; and the Judicial Council PIK-Criminal Advisory Committee has amended the PIK instruction to be consistent with it. See PIK Crim. 4th 54.050. Perhaps most persuasive in this context, the legislature has had the opportunity over the past 15 years to express any disagreement with the *Kleypas* interpretation of K.S.A. 21-4624(e) by amending the statute. It has not done so. See *State v. Jordan*, 303 Kan. 1017, 1021, 370 P.3d 417 (2016) (legislative inaction may be considered indicator of specific legislative purpose).

Because the challenged instruction was legally and factually appropriate, the district court's failure to instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt was error under state law. We thus proceed to the next analytical step and determine whether the error was clear and reversible. Cheever bears the burden to firmly convince this court that the jury would have returned a different verdict had the instructional error not occurred. This is a high standard—higher than the "reasonable likelihood" standard he advanced in his original brief and continues to

advance in his motion. See *State v. Breeden*, 297 Kan. 567, 581, 304 P.3d 660 (2013) (failure to object to instruction raises persuasive bar complaining party must hurdle on appeal); *Williams*, 295 Kan. at 518 (burden to firmly convince appellate court that the jury would have reached a different verdict had error not occurred "high hurdle").

Cheever contends that he presented substantial mitigation evidence during his penalty-phase proceeding. In his motion, Cheever recounts the mitigation evidence that he put forth, which included evidence of his drug use and drug addiction, his assertion that his judgment was impaired on the day of the crime due to drug use, his upbringing in an environment with pervasive drug use, the sabotage of his potential to lead a drug- and crime-free lifestyle by his parents, his conversion to Christianity, and his genuine remorse. Much of this evidence was boiled down into a nonexclusive list of nine mitigating circumstances that the district court provided the jury as part of the instructions.

During the penalty proceeding, the State alleged three aggravating circumstances: (1) the defendant was previously convicted of a felony in which the defendant inflicted great bodily harm on another; (2) the defendant knowingly or purposely created a great risk of death to more than one person in the present case; and (3) the defendant committed the present crime in order to avoid or prevent a lawful arrest or prosecution. The jury unanimously found beyond a reasonable doubt all three aggravating circumstances.

We have independently reviewed the complete record on appeal, including the penalty-phase proceedings in full. Cheever's effort to downplay his culpability for the murder of Samuels by relying on his drug use and upbringing, in the face of the State's proof beyond a reasonable doubt that he knowingly or purposely created a great risk of death to more than one person and committed the murder in order to avoid or prevent a

34

lawful arrest or prosecution, findings that support a heightened degree of culpability, do not firmly convince us that a jury would have returned a different verdict had the instructional error not occurred. Likewise, Cheever's mitigating evidence of his potential for rehabilitation was fully countered by the jury's unanimous finding beyond a reasonable doubt that he had a previous felony conviction in which he inflicted great bodily harm. On this evidence, there is no clear error requiring this court to vacate Cheever's death sentence.

*Constitutionality of K.S.A. 21-3439(a)(5)*

Cheever argues that the definition of capital murder under K.S.A. 21-3439(a)(5) (intentional and premeditated murder of a law enforcement officer) violates the Eighth and Fourteenth Amendments to the United States Constitution and § 9 of the Kansas Constitution Bill of Rights because it does not limit the offense to situations in which the law enforcement officer is killed while performing, or because of, his or her duties as a law enforcement officer. Without that element, all intentional and premeditated murders of persons employed as law enforcement officers can be capital murder, whether or not the killing was related to the victim's law enforcement duties. Cheever concludes, therefore, that the statute fails to "genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder" as required by the Eighth Amendment. *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983); *Scott*, 286 Kan. 54, Syl. ¶ 35.

Cheever did not raise this issue before the district court, but we have previously noted that does not preclude our review. *State v. Cheever*, 295 Kan. 229, 241, 284 P.3d 1007 (2012) (K.S.A. 21-4627[b] imposes a mandatory exception in death penalty appeals to the various statutes and rules barring consideration of unpreserved issues). Under

K.S.A. 2015 Supp. 21-6619(b), we would be required to review the issue were there not another problem with Cheever's argument that does preclude our review. It is undisputed that Samuels was engaged in the performance of his duties as a law enforcement officer at the time he was killed. Thus there is a question as to whether Cheever has standing to challenge the constitutionality of K.S.A. 21-3439(a)(5) on the ground that it does not require the victim to have been engaged in the performance of his or her duties at the time of the murder.

A party cannot raise a challenge to the constitutionality of a statute where the claimed defect does not apply to that party:

> "The general rule governing the standing of a party to challenge the constitutionality of legislation is that a litigant to whom a statute may constitutionally be applied will not be heard to challenge the statute on the ground that it may conceivably be applied unconstitutionally to others, in situations not before the court. [Citation omitted.]" *State v. Thompson*, 237 Kan. 562, 563, 701 P.2d 694 (1985).

Standing is a component of the case-or-controversy limitation on judicial power under the doctrine of separation of powers. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 896-97, 179 P.3d 366 (2008). Because the Kansas Constitution's framework "limit[s] the judicial power to actual cases and controversies," Kansas courts do not have the power to give advisory opinions. 285 Kan. at 898. To meet the case-or-controversy requirement, a party must have standing; the issue cannot be moot; the issue must be ripe; and the issue cannot present a political question. 285 Kan. at 896.

The standing requirement is based on the rule that courts do not decide cases based on purely hypothetical scenarios. See *Hall v. Dillon Companies, Inc.*, 286 Kan. 777,

36

784-85, 189 P.3d 508 (2008) (a court does not decide hypothetical cases; it "must apply the law to the case before it"); *State ex rel. Morrison*, 285 Kan. at 897. It is undisputed that the constitutional defect Cheever alleges concerning K.S.A. 21-3439(a)(5) does not apply to him. Consequently, any consideration of the issue in the context of this case would necessarily be hypothetical.

Cheever does not have standing to raise a challenge to the constitutionality of K.S.A. 21-3439(a)(5) on the ground asserted in this appeal. His lack of standing forecloses our review.

*Challenges for Cause*

Cheever argues two trial court rulings on challenges for cause to venire members during voir dire affected the penalty phase of his trial.

Under the Sixth and Fourteenth Amendments to the United States Constitution, a defendant in a capital criminal case has a right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).

> "A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." 504 U.S. at 729.

*Morgan* referred to *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), for the standard by which to judge a challenge for cause to such a potential juror:

> "*Witt* held that 'the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' [Citation omitted.]" *Morgan*, 504 U.S. at 728.

It is the duty of a trial court to see that a jury of competent, fair, and impartial persons is impaneled. *State v. Stuart*, 206 Kan. 11, 12, 476 P.2d 975 (1970). K.S.A. 22-3410(2)(i) provides a prospective juror may be challenged for cause when his or her state of mind with reference to the case or parties prevents the juror from acting impartially and without prejudice to the substantial rights of any party.

> "Because only the district court is in a position to view the demeanor of prospective jurors during voir dire, a district court's ruling on a challenge for cause will not be disturbed on appeal unless it is clearly erroneous or amounts to an abuse of discretion. *State v. Kleypas*, 272 Kan. 894, 991, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002)." *State v. Ackward*, 281 Kan. 2, 27, 128 P.3d 382 (2006).

See also *Uttecht v. Brown*, 551 U.S. 1, 9, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."); *State v. Dixon*, 248 Kan. 776, 788-89, 811 P.2d 1153 (1991).

In *Carr,* we explained:

"On appeal, the question before us is not whether we would have agreed with a district judge's decision on a strike for cause prompted by a panel member's opinion on the death penalty but whether the district judge's decision is fairly supported by the record. *Witt,* 469 U.S. at 434; see *Darden v. Wainwright,* 477 U.S. 168, 176, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (appellate courts must examine context surrounding prospective juror's exclusion, qualification). If the record contains conflicting or ambiguous information, the United States Supreme Court has expressed its belief that deference is owed to 'the trial court, aided as it undoubtedly was by its assessment of [the prospective juror's] demeanor.' *Witt,* 469 U.S. at 434." *Carr*, 300 Kan. at 114.

*Venire Member J.S.W.*

Initially, Cheever disputes the trial court's denial of his challenge to venire member J.S.W. on the basis of her statement that she would be "leaning" in favor of the death penalty once premeditated intentional killing had been found beyond a reasonable doubt.

Venire member J.S.W. made several statements providing a context from which Cheever has extracted a small sample. She indicated that she could presume Cheever not guilty, that she could follow instructions concerning the effects of drugs on the defendant's mental state, and that she understood and would respect the fact that it only took one juror dissenting from a death sentence to cause the imposition of a life sentence. She also stated that she understood that the weighing of aggravating and mitigating circumstances was not simply a mathematical process. She stated that she realized there were some situations in which the death penalty should not be given and that if Cheever were convicted she would need to consider both the death penalty and a life sentence. She indicated that she thought she could impose a life sentence under certain circumstances. In a lengthy exchange with the prosecutor, she indicated that she would not use a "one-size-fits all" approach.

39

The trial judge observed that the question was "whether or not [J.S.W.] can fairly and objectively consider both options of a death sentence and life in prison without the possibility of parole, and whether or not her leaning would substantially interfere with her ability to do that evaluation process" and concluded that her views would not interfere with her ability to engage in the weighing process as instructed. There is ample record support for the trial judge's conclusion and we find nothing to indicate an abuse of discretion.

*Venire Member T.D.*

Next Cheever argues that the trial judge erroneously dismissed venire member T.D. because of her religious beliefs. Cheever makes arguments under the Eighth Amendment to the United States Constitution and under § 7 of the Kansas Constitution Bill of Rights to support this contention.

In her juror questionnaire, T.D. wrote "I am against the death penalty. I am against the death penalty ever being imposed. I can give someone a life sentence." In another answer she wrote, "I can't see myself being able to impose the death penalty." In response to questioning by the State, T.D. confirmed those answers reflected her position. She told the prosecutor that her feelings would not prevent her from judging the defendant's guilt. But if it came to imposing a penalty, T.D. stated that she could not see herself ever changing her opinion on the death penalty and that she would automatically vote for a life sentence. She confirmed that she could not and would not follow the court's instructions if they resulted in a death sentence.

Based on these answers, the State challenged T.D. for cause. When Cheever's counsel asked T.D. if her opposition came "in part" from her religion, she responded

40

"[m]aybe a little bit, yes." In response to questioning by the trial judge, T.D. confirmed that her opposition to the death penalty was based in part on her religious beliefs and in part on other personal beliefs. And she affirmed once again that she could not consider both the death sentence and life without parole if the defendant were convicted of capital murder but would automatically choose a life sentence. The trial judge granted the State's challenge for cause.

Under the Sixth Amendment, the trial judge's exclusion of T.D. in this death penalty proceeding was clearly appropriate. Her answers established that her personal views substantially impaired her ability to perform her duties as a juror in accordance with her oath and the court's instructions. Moreover, under the Sixth Amendment, the fact that T.D.'s personal views were based in part on her religious beliefs makes no difference in the analysis because her removal is based on her inability to impartially follow the law and instructions and not upon her religious beliefs. *Lockhart v. McCree*, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) (impartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts).

But Cheever, in an apparent attempt to avoid the Sixth Amendment jurisprudence, argues that the Eighth Amendment prohibits the removal of T.D. from the panel. The Eighth Amendment requires that the jury not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). Cheever's argument that the Eighth Amendment entitles him to select jurors who, because of their own religious beliefs, will view mitigating evidence from a certain point of view, namely, one that eschews the death penalty, is based on a premise that a juror's religious viewpoint is, in itself, a mitigating factor. It is a novel argument, but Cheever provides no

41

authority to support it and our research has uncovered none. Moreover, it seems difficult to justify with the precedent of the United States Supreme Court that focuses on the ability of a juror to impartially consider the death penalty while allowing the states "'to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty."'" *Johnson v. Texas*, 509 U.S. 350, 362, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993); *cf. People v. Taylor*, 48 Cal. 4th 574, 603, 108 Cal. Rptr. 3d 87, 229 P.3d 12 (2010) (defendant's Eighth Amendment challenge to death qualification of jury was lacking in merit, where the challenge was in essence a restatement of his claims under other constitutional provisions); *People v. Johnson*, 3 Cal. 4th 1183, 1213, 14 Cal. Rptr. 2d 702, 842 P.2d 1 (1992) (same).

Cheever also bases his objection to the dismissal of T.D. on § 7 of the Kansas Constitution Bill of Rights, specifically that part which provides:

> "No religious test or property qualification shall be required for any office of public trust, nor for any vote at any election, nor shall any person be incompetent to testify on account of religious belief."

Cheever maintains that the office of juror is an office of public trust and § 7 prohibits exclusion from juror service on the basis of religion. This precise claim was considered and rejected by the court in *Kleypas*, 272 Kan. 894. Kleypas had argued that § 7 "should be read to provide a further limitation on the State's power to exclude prospective jurors based on their religious opposition to the death penalty." 272 Kan. at 992-93. Kleypas supported his constitutional argument, as Cheever does, by pointing to K.S.A. 43-156 which provides:

> "No person shall be excluded from service as a grand or petit juror in the district courts of Kansas on account of race, color, religion, sex, national origin, or economic

status. Every juror, grand and petit, shall be a citizen of the state, resident of the county and possess the qualifications of an elector as now, or in the future established."

The *Kleypas* court held that § 7 of the constitution provided no greater protection than provided by K.S.A. 43-156. *State v. Kleypas*, 272 Kan. 894, 993, 40 P.3d 139 (2001).

As noted above, K.S.A. 22-3410(2)(i) provides that a prospective juror may be challenged for cause as unqualified to serve when he or she is partial or biased. In *State v. Carr*, 300 Kan. 1, 124, 331 P.3d 544 (2014), we recognized the tension created by the interaction of the two statutes "when the reason a prospective juror can never participate in imposition of the death penalty, compelling removal of that person for cause, has a basis in a religious code."

In *Kleypas*, we determined that the jurors at issue in that case were excused "due to their inability to be impartial and follow their oath as jurors regarding consideration of the death penalty, not on religious grounds." 272 Kan. at 993. And our *Carr* decision recognized the key distinction in this situation is that between belief and behavior.

> "[J]urors cannot be discriminated against on the basis of their religious belief or lack of belief. But they can be excluded from jury service when their belief or nonbelief makes it impossible for them to act in conformance with the signature requirement of that service: impartiality under the rule of law." 300 Kan. at 124.

Significantly, the State raised its challenge for cause to T.D. before any mention of her religious beliefs arose but after she had repeatedly said, both in writing and in open court, she could not and would not consider the death penalty regardless of how she was instructed by the court. The record establishes the trial judge had more than adequate support to conclude that T.D. could not impartially carry out her obligations as a juror in a death penalty case, and doing so did not violate the Kansas Constitution. *Cf. State v.*

43

*Clark*, 128 N.M. 119, 129, 990 P.2d 793 (1999) ("fact that the potential juror's inability to perform his or her duty is based upon religious objection and belief does not violate the religious protections of the New Mexico Constitution, because exclusion from the jury was not based upon religious affiliation").

*Orientation Remarks*

During orientation remarks to the seven venire panels, the trial judge explained the court reporter took a complete record of the proceedings in the courtroom in part for the purpose of appellate review "and the appellate court decides all issues on appeal based on that record that we've made here in the trial court." Cheever argues that the remarks violated the Eighth Amendment to the United States Constitution as applied in *Caldwell v. Mississippi,* 472 U.S. 320, 328-29, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), which held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." We discussed *Caldwell* in our earlier decision in this case, along with *State v. Nguyen*, 251 Kan. 69, 80, 833 P.2d 937 (1992) (holding a trial court should not mention a defendant's right to appeal). Because we were reversing on other grounds, we made no determination whether the trial court's remarks in this case rose to the level of constitutional error or gave grounds for reversal under state law. See *Cheever*, 295 Kan. at 260-61. We now determine they did not.

The crux of a *Caldwell* violation is giving the jury misleading information which improperly minimizes its role in the death penalty process. *Cheever*, 295 Kan. at 260.

> "[W]e . . . read *Caldwell* as 'relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to

44

feel less responsible than it should for the sentencing decision.' *Darden v. Wainwright,* 477 U.S. 168, 184, n. 15[, 106 S. Ct. 2464, 91 L. Ed. 2d 144] (1986). Thus, '[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.' [Citations omitted.]" *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994).

Here the trial judge's remarks did not concern the role of the jury. They were an accurate statement of the fact that one reason court reporters record trial proceedings is to provide a record for appellate review. Consequently, we conclude there was no constitutional error presented by the judge's remarks. See *State v. Braxton*, 352 N.C. 158, 175-76, 531 S.E.2d 428 (2000) (trial court's statement before jury selection that transcription of the case would allow Supreme Court review, trial court's passing references to appellate review during voir dire did not dilute responsibility of jury, did not invalidate the death sentence, did not violate the Eighth Amendment; statements did not imply Supreme Court would correct any errors the jury might make).

Nonetheless, we were unequivocal in *Nguyen* in our statement that a trial court should avoid any mention of a defendant's right to appeal. Our holding was based upon much the same rationale as that underlying the Supreme Court's decision in *Caldwell*; the mention of appellate review could lessen the jury's sense of responsibility for the correctness of its decision and its importance and may lead jurors to conclude any mistake they make in their findings of fact or, in a capital case, in the choice of sentence, would be corrected on appeal. See *Nguyen*, 251 Kan. at 79-80. *Nguyen* was not a capital case, but in our prior decision in this case "we . . . reiterate[d] our general directive:  It is improper for a trial court to make comments to the jury regarding appellate review [and] we emphasize[d] that the life-or-death stakes in a capital murder proceeding require extra vigilance on the part of the trial court to abide by this directive." *State v. Cheever*, 295 Kan. 229, 261, 284 P.3d 1007 (2012).

45

That said, our cases have held that judicial comments that are not instructions to the jury are reviewed under judicial misconduct standards. Both parties pointed to this standard of review in their briefs. "In cases alleging judicial misconduct, this court's standard of review is unlimited. The question is whether [the defendant]'s substantial rights to a fair trial were prejudiced by the court's statements. [The defendant] bears the burden of showing his substantial rights were prejudiced." *State v. Kirkpatrick*, 286 Kan. 329, 348, 184 P.3d 247 (2008), *abrogated on other grounds by State v. Sampson*, 297 Kan. 288, 301 P.3d 276 (2013). In making the determination, we must look to the particular facts and circumstances of the case.

While we are mindful that this is a capital case in which the jury imposed a death penalty, we find no indication whatsoever that Cheever's rights were prejudiced by the trial judge's factual statements regarding the court reporter's duties. The statements were among the earliest remarks the eventual jurors heard, and any effect they might have had was surely attenuated by the voir dire process, the trial, and the instructions informing jurors of their responsibilities in both the guilt phase and the penalty phase. Trial judges should not mention appellate review to juries, but the brief and strictly factual mention to the panels in this case, before voir dire had begun and jurors were actually selected, is not grounds for reversal.

*Age at Time of Crime*

"Capital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring v. Arizona*, 536 U.S. 584, 589, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). In our previous decision, we held that because K.S.A. 21-4622 and K.S.A. 21-4624(b) condition the capital sentencing hearing on the defendant being 18 years of age at the time of the commission of the capital murder, "the fact the defendant was at

46

least 18 years old at the time of the crime is a fact necessary to subject the defendant to the death penalty and therefore within the scope of Sixth Amendment protection." *Cheever*, 295 Kan. at 264-65. We also noted that *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), categorically prohibits the imposition of the death penalty on individuals who were under 18 at the time they committed a capital offense. *Cheever*, 295 Kan. at 264. But, because we were reversing on other grounds, we did not assess the effect of the trial court's failure to have the jury make a finding beyond a reasonable doubt of Cheever's age at the time of the crime. 295 Kan. at 265 ("[W]e need not decide whether the failure to instruct the jury to find the defendant's age was harmless under the facts of this case.") (citing *State v. Colston,* 290 Kan. 952, 975, 235 P.3d 1234 [2010], and *State v. Reyna,* 290 Kan. 666, Syl. ¶ 10, 234 P.3d 761 [2010] [harmless error analysis applies to error in omitting element of defendant's age where age was uncontested and supported by overwhelming evidence]). We need to make that determination now.

Cheever does not contest that he was over the age of 18 on the day he killed Samuels. In fact, the record is replete with evidence from which the jury could have made that finding. Cheever testified at trial in October 2007 that he was 26 years old and that his date of birth was August 19, 1981. Those facts would make him 23 years old at the time of the offense. Cheever also testified that he graduated from high school in May 1999. In addition, Greenwood County Sheriff's Detective Mike Mullins testified that he believed that Cheever was "roughly" 23 years old on January 19, 2005.

At the penalty phase, one of Cheever's mitigating factors was that he was 23 years old at the time of the crime. Cheever's high school transcript was admitted as an exhibit. The transcript reflected Cheever's date of birth and his high school graduation date. Several witnesses testified to their knowledge or observation of Cheever's age during the penalty phase of Cheever's trial. Cheever's mother, Brenda Friesner, testified that

Cheever was born on August 19, 1981, and made other references to his age. Cheever's aunt, Teresa Aikman, also referred to Cheever's age during her testimony. Robert Sanders, the victim of Cheever's prior conviction of attempted aggravated robbery, testified that the man who attacked him appeared to be 19 to 20 years old. The date of that offense was May 24, 2000.

Cheever's own testimony during the guilt phase of trial, which was corroborated by Mullins' testimony, as well as Cheever's own arguments and the evidence and testimony of other witnesses during the penalty phase, clearly established that he was 23 years old at the time of the offense. Because the record did not contain evidence that could rationally lead a jury to find that Cheever was under the age of 18 at the time of the offense, any error in failing to have the jury find his age was harmless. See *Reyna*, 290 Kan. at 681 ("[T]his court will apply the harmless error analysis to the omission of an element from the instructions to the jury when a review of the evidence leads to the conclusion beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error.").

*Constitutionality of K.S.A. 21-4624(c)*

Cheever also raises an objection to the relaxed evidentiary standard of K.S.A. 21-4624(c). Under that provision, any evidence relevant to the question of sentence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. We did not address his arguments under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in our prior decision; however, his Sixth Amendment argument based on *Ring* was rejected in *State v. Scott*, 286 Kan. 54, 99-101, 183 P.3d 801 (2008), and his Eighth Amendment argument

based on the need for "heightened reliability" in death penalty proceedings was rejected in *Kleypas*, 272 Kan. at 1036-43. He has given us no additional authority or any other reason to reconsider those rulings, and we decline to do so. Moreover, he points to no specific evidence presented in his penalty hearing that fell below the standards he advocates.

Cheever makes an additional argument, based on the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), that the statute is unconstitutional because it allows introduction of testimonial hearsay evidence. Notably, Cheever does not contend that any testimonial hearsay was admitted during his penalty-phase proceeding. See *State v. Williams*, 299 Kan. 911, 918, 329 P.3d 400 (2014) ("Generally, 'if there is no constitutional defect in the application of the statute to a litigant, [the litigant] does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.'"). Because Cheever points to no testimony that would be disallowed by the rule he wants applied, he lacks standing to raise a challenge to the rule's constitutionality.

*Prosecutorial Misconduct*

In our prior decision we found that one remark made in closing by the prosecutor "crossed the line between comment on the weight of the evidence as it relates to specific mitigating circumstances and argument to the jury that it *could not* consider a mitigating circumstance *as a matter of law*." *Cheever*, 295 Kan. at 272-73 ("'[Y]ou've already decided methamphetamine did not play a role in the capital murder of Matt Samuels. And you should reject it now.'"). In *Kleypas*, this court recognized the "subtle differences" between applying the constitutional harmless error test to prosecutorial misconduct during the guilt phase proceeding and during the penalty-phase proceeding. 272 Kan. at 1084. This court explained:

"[T]he standard of review and the ultimate question that must be answered with regard to whether prosecutorial misconduct in the penalty phase of a capital trial was harmless is whether the court is able to find beyond a reasonable doubt that the prosecutorial misconduct, viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. In this determination, the overwhelming nature of the evidence is a factor to be considered, although its impact is limited. Also, in making the determination as to whether an error was harmless, it is important to recognize that the question for the reviewing court is not what effect the constitutional error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual verdict in the case at hand. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). 'The inquiry, in other words, is not whether, in a trial that occurred without the error, a [verdict for death] would surely have been rendered, but whether the [death verdict] actually rendered in this trial was surely unattributable to the error.' 508 U.S. at 279." *Kleypas*, 272 Kan. at 1087-88.

Applying that standard now, we conclude the prosecutor's improper remark would not have affected the death verdict ultimately rendered by the jury in Cheever's case. The remark itself was equivocal. As we noted there, the prosecutor told the jury it "*should*" reject the influence of methamphetamine as a mitigator. He did not tell the jury it *could not* consider it. And while we continue to disapprove of the remark, our conclusion that "it could lead a juror to refuse to consider legally relevant mitigating evidence," was speculative. *Cheever*, 295 Kan. at 273. We hold the error harmless.

*Cumulative Error*

Finally, we consider Cheever's claim that cumulative error deprived him of a fair penalty-phase proceeding.

50

Cheever cites *State v. Ackward*, 281 Kan. 2, 128 P.3d 382 (2006), for the standard of review. In *Ackward*, this court explained:

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant." 281 Kan. at 29.

The State cites an identical standard contained in *State v. Lumbrera*, 252 Kan. 54, 845 P.2d 609 (1992). But neither *Ackward* nor *Lumbrera* is a death penalty case. And certain language in the cited cumulative-error standard suffers from a literal application when considering a claim of cumulative error during the penalty phase of a capital trial. For instance, the *Ackward* standard speaks in terms of the "reversal of the defendant's *conviction*." (Emphasis added.) 281 Kan. at 29. But Cheever does not contend that the combination of errors during the penalty-phase proceeding require the reversal of his conviction. Instead, he asserts that the errors require this court to vacate his sentence. Further, as will be discussed below, although the overwhelming evidence against a defendant can serve as a bar to finding prejudicial cumulative error in the guilt phase, there is no such bar in the penalty phase because the overwhelming nature of the evidence is merely a factor to consider—a factor that carries little weight. See *Kleypas*, 272 Kan. at 1088.

In *Kleypas*, we noted "subtle differences" between applying the constitutional harmless error test to prosecutorial misconduct during the guilt-phase proceeding and the penalty-phase proceeding. 272 Kan. at 1084-88. We noted this standard above but repeat it here for convenience.

"[T]he standard of review and the ultimate question that must be answered with regard to whether prosecutorial misconduct in the penalty phase of a capital trial was harmless is whether the court is able to find beyond a reasonable doubt that the prosecutorial misconduct, viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. In this determination, the overwhelming nature of the evidence is a factor to be considered, although its impact is limited. Also, in making the determination as to whether an error was harmless, it is important to recognize that the question for the reviewing court is not what effect the constitutional error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual verdict in the case at hand. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). 'The inquiry, in other words, is not whether, in a trial that occurred without the error, a [verdict for death] would surely have been rendered, but whether the [death verdict] actually rendered in this trial was surely unattributable to the error.' 508 U.S. at 279." *Kleypas*, 272 Kan. at 1087-88.

Within the context of prosecutorial misconduct, we recognized that although individual instances of misconduct may be harmless in and of themselves, the total effect of the cumulative misconduct may require this court to vacate a defendant's sentence and remand for resentencing.

"[E]ven if instances of prosecutorial misconduct are harmless error in and of themselves, their cumulative effect must be analyzed. See *State v. Valdez*, 266 Kan. 774, 802, 977 P.2d 242 (1999) (noting that cumulative errors may be so great as to require reversal). For a cumulative error analysis, the focus is on the net prejudicial effect the total prosecutorial misconduct had on the jury's ultimate verdict. The question is whether the total effect of the cumulative misconduct found to exist, viewed in light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances." *State v. Kleypas*, 272 Kan. 894, 1088, 40 P.3d 139 (2001).

Our *Kleypas* decision provides us guidance on our standard of review and analytical framework applicable to claims of penalty-phase cumulative error.

We hold that when considering a claim that cumulative error infected the penalty-phase proceeding, our test is whether we are able to find that the total cumulative effect of the errors, viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. See *Kleypas,* 272 Kan. at 1087. The degree of certainty by which we must be persuaded turns on whether any of the errors infringe upon a right guaranteed by the United States Constitution. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). The overwhelming nature of the evidence is a factor to be considered, but its impact is limited. As with the prosecutorial-misconduct analysis, the question before this court is not what effect the error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual sentencing determination in the case on review. See *Kleypas*, 272 Kan. at 1088.

Having clarified the standard of review and analytical framework appropriate for a claim asserting penalty-phase cumulative error, we note that we were not as precise in *State v. Robinson*, 303 Kan. 11, 363 P.3d 875 (2015). In *Robinson*, we quoted a standard of review in both the guilt-phase cumulative-error discussion and the penalty-phase cumulative-error discussion that was nearly identical to the standards advanced by Cheever and the State in this case. See 303 Kan. at 288, 337 (quoting *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 [2009]). Although the result would not have been different in that case under the standard articulated here, we disapprove of the standard as presented in *Robinson*.

We note that Cheever contends certain guilt-phase testimony was erroneous, and he includes this asserted guilt-phase error for our consideration with respect to the cumulative effect of error on the sentencing determination. We have concluded the testimony was not erroneous; thus we do not consider it in our cumulative-error analysis. Nevertheless, we agree with Cheever that certain guilt-phase errors, although they do not individually or collectively require reversal of the conviction, could be of such a nature that they impact the sentencing determination when the same jury decides both guilt and sentence.

The individual penalty-phase errors we have identified are the district court's improper but factual comment on the role of the record on appeal, the failure of the instructions to require the jury to find Cheever was over 18 years old at the time of the crime, the district court's failure to instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt, and the prosecutor's improper comment on the influence of methamphetamine as a mitigator. Because the failure to require the jury to find Cheever was over 18 years old and the prosecutor's improper comment implicate constitutional rights, we must be satisfied beyond a reasonable doubt that the total effect of the cumulative errors, viewed in light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. See *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011) ("In a cumulative error analysis, '[i]f any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.'").

We have no difficulty concluding beyond a reasonable doubt that, collectively, these errors had little, if any, effect on the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. The four errors during the penalty phase

were isolated, and no one error compounded any negligible prejudicial effect arising out of any of the other three errors.

First, the district court's remark about appellate review was too far removed from the sentencing deliberations to have factored into them. Second, in light of Cheever's asserted mitigating factor that he was 23 years old at the time of the crime, there was little, if any, prejudice to the jury's weighing process arising from the district court's failure to instruct the jury that it had to find Cheever was at least 18 years old at the time of the crime.

The third identified error involves the district court's failure to instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt. Earlier in this decision we reviewed this error for clear error under state law. But, as noted above, our consideration of the impact of this instructional error on cumulative error requires that we apply a standard of review that is less burdensome than the clear error standard previously applied. Nevertheless, for the reasons articulated in the section addressing this instructional error above, we are convinced beyond a reasonable doubt that there was little, if any, likelihood that the instructional error combined with any of the other errors to impact the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances.

Finally, the prosecutor's improper comment on the influence of methamphetamine was an isolated, equivocal statement that did not increase the net prejudicial effect of the errors previously identified.

In light of the record as a whole, the total effect of these errors had very little, if any, likelihood of changing the jury's ultimate conclusion that death was the appropriate sentence.

CONCLUSION

The issues raised in Cheever's original brief which we have not revisited here were decided against him in *State v. Cheever*, 295 Kan. 229, 284 P.3d 1007 (2012). Thus, no issue raised by Cheever warrants reversal. Accordingly, we affirm Cheever's convictions and sentences for capital murder of a law enforcement officer and for four counts of attempted capital murder of a law enforcement officer. His convictions for the manufacture of methamphetamine and for criminal possession of a firearm were affirmed in our previous decision. Consequently, Cheever's sentences for those charges also stand.

Affirmed.

MICHAEL J. MALONE, Senior Judge, assigned.[2]

* * *

LUCKERT, J., concurring: I concur in the majority's decision to affirm Scott Cheever's convictions and sentence, but I do not agree with the portion of the majority's modified decision holding the district court did not err in allowing Dr. Michael Welner's testimony that (1) Cheever was an outlaw whose bad character, rather than methamphetamine intoxication, led him to shoot Sheriff Matthew Samuels and (2) Cheever felt no remorse for his actions. K.S.A. 60-447 prohibits the admission of this evidence. I conclude, however, the State met its burden of establishing a reasonable

---

[2]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 99,988 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.

probability that the introduction of this character evidence did not affect the outcome of the trial in light of the entire record, and thus I concur in the result reached by the majority.

K.S.A. 60-447 provides:

"Subject to K.S.A. 60-448, when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that (a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible, and (b) in a criminal action evidence of a trait of an accused's character as tending to prove guilt or innocence of the offense charged, (i) may not be excluded by the judge under K.S.A. 60-445 if offered by the accused to prove innocence, and (ii) if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her good character."

Two aspects of this statute lead me to conclude that error occurred. First, K.S.A. 60-447 applies when a defendant's character is used to prove conduct, and that is what happened in this case. Second, in this criminal case, the State could only introduce character evidence to prove guilt if Cheever had first introduced evidence of his good character. But the State took the first step of admitting evidence regarding Cheever's character—a fact both the State and the majority ignore.

In its case-in-chief, the State introduced evidence of Cheever's bad character when it sought the admission of the letters Cheever wrote to Nathan Fife and Crystal Mackey. As the majority notes, these letters included confessions by Cheever and his narrative of the events related to the shooting and his arrest. These portions of the letters are not at issue. But the letters also included statements about character. Specifically, Cheever stated he was an "outlaw until they bury me" and he would "do it again in a heartbeat."

57

These statements about character should not have been admitted in the State's case-in-chief (and thus clearly before Cheever could have introduced evidence of his good character).

Without question, the reference to Cheever being an "outlaw" commented on his character, indicating he was an "odious" character who acted out of "rebellion and contumacy." *Dale County. v. Gunter*, 46 Ala. 118, 130 (1871); see also Black's Law Dictionary 404, 1277 (10th ed. 2014) (defining "outlaw" as "[a] lawless person or habitual criminal; esp. a fugitive from the law" and "contumacy" as "[c]ontempt of court; the refusal of a person to follow a court's order or direction"). Courts have uniformly viewed references to the traits of an "outlaw" as evidence of character. See, *e.g.*, *People v. Cordova*, 293 P.3d 114, 122 (Colo. App. 2011) ("although the prosecutor's characterization of defendant as an 'outlaw' during opening argument may have been permissible oratory, his statements implying that, as an outlaw, defendant respected few and feared none were improper attributions of traits of character"); *Clark v. State*, 915 N.E.2d 126, 129-30 (Ind. 2009) (where defendant "made his character a central issue" of trial, state could admit defendant's social media posting that "'[s]ociety labels me as an outlaw'"); *State v. Day*, 341 S.C. 410, 423-24, 535 S.E.2d 431 (2000) (use of term "outlaw" impugned defendant's character and resulted in reversible error). Indeed, this court reached the same conclusion in Cheever's first appeal when it concluded that Dr. Welner had "characterized Cheever as a person who had chosen an antisocial outlaw life style and who was indifferent to the violence he had committed." *State v. Cheever*, 295 Kan. 229, 256-57, 284 P.3d 1007 (2012) (*Cheever I*), *vacated and remanded* 134 S. Ct. 596 (2013).

Likewise, evidence about remorse constitutes character evidence in light of the general view that "'[t]he repentant person has a better character than the unrepentant person.'" Eisenberg, Garvey, & Wells, *But Was He Sorry? The Role of Remorse in*

58

*Capital Sentencing*, 83 Cornell L. Rev. 1599, 1605-06 nn.22 & 23 (1998) (quoting Murphy, Repentance, Punishment, and Mercy, in Repentance: A Comparative Perspective 143, 148-49, 157 [1997] and explaining that remorse mitigates both in a deterrence framework, by showing that the defendant is "'less likely to commit crimes again,'" and in a retribution framework, by showing that the defendant "'has a better character'").

After the State introduced evidence that Cheever possessed the character of an unremorseful outlaw, Dr. Welner linked the character evidence to Cheever's conduct. He essentially testified that Cheever's shooting of Sheriff Samuels and the other law enforcement officers was driven by Cheever's outlaw mentality—not by methamphetamine-induced paranoia or aggressiveness. Dr. Welner made the link between character and conduct when he testified:

> "I don't think that the methamphetamine affected [Cheever's] decision to be an outlaw and to identify with outlaws and to make decisions as outlaws do. I think that it is possible, possible, that methamphetamine made him more aggressive. But it was making a person aggressive who was armed to begin with and who identified not only with outlaws but outlaws who were engaged in fatal shootouts with police officers."

By attributing Cheever's conduct to his character as an unremorseful outlaw, Dr. Welner made the link K.S.A. 60-447 prohibits unless the exception applies—that is, unless Cheever first introduced evidence of his good character. See K.S.A. 60-447(b)(ii).

As discussed, the character evidence first came into the trial during the State's case-in-chief and before Cheever had put on any evidence. Cheever's counsel did not object to the admission of the two letters, however. This lack of objection would typically end any analysis of the error because Cheever failed to preserve the issue through an "objection to the evidence timely interposed and so stated as to make clear the specific

ground of objection." K.S.A. 60-404; see *State v. King*, 288 Kan. 333, 342, 204 P.3d 585 (2009). A different rule applies in this case, however, because the legislature has directed this court to consider any issue raised in a capital murder appeal, even those not properly preserved. See, *e.g.*, *State v. Kleypas*, 305 Kan. 224, 260-62, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017) (collecting cases discussing K.S.A. 21-4627[b], now recodified at K.S.A. 2016 Supp. 21-6619[b] and reiterating that under this legislative directive this court must consider an issue raised by the party even if not properly preserved during district court proceedings); *State v. Cheever*, 304 Kan. 866, Syl. ¶ 6, 375 P.3d 979 (2016) (*Cheever II*) ("K.S.A. 2015 Supp. 21-6619[b] imposes a mandatory exception in death penalty appeals to various statutes, rules, and prudential practices barring consideration of unpreserved issues."); *State v. Robinson*, 303 Kan. 11, Syl. ¶ 44, 363 P.3d 875 (2015) ("The failure to lodge a contemporaneous objection to the admission of evidence typically forecloses subsequent challenge on appeal. However, in capital murder appeals, K.S.A. 21-4627[b], recodified as K.S.A. 2014 Supp. 21-6619[b], compels review of any issue raised in defendant's brief, even if not preserved below."), *disapproved of on other grounds by Cheever II*, 304 Kan. at 902.

K.S.A. 2016 Supp. 21-6619(b) effectively requires the State to comply with the rules of evidence regardless of whether a defendant objects. This means prosecutors must carefully analyze evidence and preemptively remove objectionable material or otherwise refrain from its use. Here, that meant the State should have redacted Cheever's statements about his character from the letters he wrote to Fife and Mackey before seeking to admit the letters into evidence. This redaction could have been easily accomplished, and the State could still have used the admissible portions of the letters, including Cheever's confessions and narrative about the shootings. See *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013) (distinguishing evidence of actions and facts from character evidence).

Nevertheless, the majority downplays the effect of this rule because Cheever later testified regarding the letters. From his testimony about the letters, which did not include any direct statement that Cheever was or was not an "outlaw," the prosecutor questioned Cheever about whether he saw himself as an outlaw at the time of the shootout. Cheever conceded that he did. The prosecutor pursued similar questions about Cheever's outlaw character with other witnesses, most significantly with Dr. Roswell Lee Evans, Jr. Because Cheever clearly talked about his character and insinuated that when free from the effects of methamphetamine he possessed remorse, the majority concludes the State had every right to rebut that evidence.

I disagree. It is well-settled that a party cannot open the door for itself in order to admit otherwise inadmissible evidence. *E.g.*, *State v. McClanahan*, 259 Kan. 86, 94, 910 P.2d 193 (1996). Yet the State opened the door by admitting the Fife and Mackey letters without redacting the statements in which Cheever commented on his character. Once the State put the letters into evidence, Cheever was compelled to attempt to defuse the inflammatory and prejudicial nature of the impermissible evidence both through his testimony and the testimony of Dr. Evans. Consequently, in this capital case, I would hold the State opened the door and it cannot take advantage of having done so by pointing to Cheever's attempt to rebut the damage caused by the State's evidence. The State introduced error, and Cheever's subsequent testimony did not give the State a free pass that excused—or justified exploiting—the error.

Moreover, the State never argues that Cheever's testimony meets the requirements of K.S.A. 60-447, which provides that the character evidence, "if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her good character." Rather than explaining how this condition was satisfied at trial, the State concedes that Cheever had not admitted evidence of his *good* character. In fact, it seeks to vilify Cheever by emphasizing Cheever's testimony that

reflected his *bad* character. Nevertheless, the majority gives the State a free pass on meeting this condition precedent, stating: "We believe the State was too hasty in conceding that Cheever did not introduce evidence of his good character." Slip op. at 11. Typically, however, we consider that a party has waived or abandoned an issue if it is not briefed. *State v. Logsdon*, 304 Kan. 3, 29, 371 P.3d 836 (2016). The majority not only ignores this general rule, it creates the State's argument. This seems particularly inappropriate in a case where the argument provides the requisite condition for the evidence to be admissible in the first place. The State never articulates its rationale for the admission of the character evidence contained in the letters it admitted into evidence.

I also reject the State's contention that Cheever's intoxication defense opened the door to Dr. Welner's testimony about Cheever's character. Certainly, the State had the right to rebut Cheever's defense that his methamphetamine intoxication prevented him from forming the required intent to commit capital murder; as a result, the district court properly admitted much of Dr. Welner's testimony. But Dr. Welner's testimony crossed permissible lines when he used Cheever's traits of character to prove Cheever premeditated the death of Sheriff Samuels.

In light of this statutory error, the next question becomes whether this error requires reversal. In Cheever's first appeal, this court reversed Cheever's conviction based on Dr. Welner's testimony but did so on constitutional grounds that made it unnecessary to discuss the evidentiary issue now being considered. *Cheever I*, 295 Kan. at 257. This court's previous discussion of harmless error based on that testimony does not automatically transfer to the current discussion of error for two reasons.

First, the court previously found that *all* of Dr. Welner's testimony should have been excluded. 295 Kan. at 251. Here, I would find that only a relatively small *portion* of Dr. Welner's testimony, along with other evidence regarding character, should have been

62

excluded. While the character evidence bolster's Dr. Welner's opinion, when his testimony is read without any reference to Cheever being an outlaw or a person lacking remorse, it still presents a strong rebuttal of Cheever's defense.

Second, in this court's previous discussion of harmless error, the constitutional standard applied. Under this standard, the State had to establish "'there is no reasonable possibility that the error affected the verdict.'" *Cheever I*, 295 Kan. at 254 (quoting *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 [2011]*, cert. denied* 56 U.S. 1221 [2012]). Here, because I would find statutory—not constitutional—error, the State faces a lower burden where the error will lead to reversal only if there is "a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." *Ward*, 292 Kan. 541, Syl. ¶ 6. I would hold the State met this lower burden. As previously noted, even without the character evidence, Dr. Welner's testimony strongly rebuts Cheever's defense. And other evidence supports the State's theory that Cheever premeditated the murder of Sheriff Samuels and acted with the necessary intent to commit the other crimes. I would therefore affirm Cheever's convictions.

As to the effect of the evidence on the penalty phase, in sentencing proceedings of capital murder cases, evidence of any matter a court deems relevant to the question of sentencing can be admitted and "regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements." K.S.A. 2016 Supp. 21-6617(c). Hence, the character evidence could have been considered during the penalty phase regardless of whether Cheever had introduced evidence of his good character. The difference in the timing of when the jury heard the evidence, whether during the guilt or penalty phase, would have had no effect on the jury's verdict to impose the death penalty.

Accordingly, I would find error in the State's admission of character evidence during the guilt phase of the trial, but I would not reverse based on the error.

MICHAEL J. MALONE, Senior Judge, joins the foregoing concurring opinion.

\* \* \*

JOHNSON, J., dissenting:  I disagree with the majority's decision to uphold the death penalty in this case. I have recently stated my belief that the death penalty violates the prohibition against cruel or unusual punishment in § 9 of the Kansas Constitution Bill of Rights. See, *e.g.*, *State v. Robinson*, 303 Kan. 11, 357, 363 P.3d 875 (2015) (Johnson, J., dissenting).

Nevertheless, even if the death penalty is not an unconstitutionally cruel or unusual punishment for the citizens of Kansas, a capital murder trial must be conducted in accordance with our state's rules of law, especially those plainly set forth in Kansas statutes. As Justice Marla J. Luckert aptly explains in her concurrence, the State in this case failed to follow the rules set forth in K.S.A. 60-447(b) that serve to constrain the State's use of an accused's character trait to prove conduct that establishes the accused's guilt. While agreeing with Justice Luckert's error analysis, I take the liberty of making a few comments in that regard.

The majority characterizes the State's concession—that Cheever did not introduce evidence of his good character—as simply being "too hasty." Slip op. at 11. That characterization is too clever by half. For appellate purposes, the important aspect of the concession is that the State did not brief, argue, or provide support with pertinent authority for the point that the State was in compliance with K.S.A. 60-447(b) because Cheever had introduced evidence of his good character. *Cf. State v. Williams*, 303 Kan

64

750, 758, 368 P.3d 1065 (2016) (issue not briefed deemed waived or abandoned); *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015) (point raised incidentally but not argued also deemed abandoned); *State v. Murray*, 302 Kan. 478, 486, 353 P.3d 1158 (2015) (failure to support a point with pertinent authority akin to failing to brief the issue). Pointedly, the majority fails to explain why it is permitted to assume the role of prosecutor and make arguments that the State's actual representative has waived and abandoned.

With respect to the merits of the majority's court-made argument that Cheever introduced evidence of his good character, I submit that it plays fast and loose with the facts, something we would ordinarily not allow the actual prosecutor to do. For instance, the majority declares that Cheever "disavowed his earlier outlaw persona," when no such statement appears in the record. Slip op. at 15.

In my view, K.S.A. 60-447(b) furthers the concept that an accused should be convicted of a crime based upon evidence that the person actually committed the proscribed acts, rather than on evidence of a character trait that suggests the accused is the type of person who *could* have committed those acts. After all, the requisite elements of capital murder that the State had to prove beyond a reasonable doubt were the same whether Cheever was deemed to be a remorseless outlaw or a penitent saint. The majority's creative application of the statute in this case undermines its purpose.

I am also baffled by the majority's declaration that

"[i]t would be unfair to permit Cheever to testify about his bad character at the time of the murder and to attribute it to his methamphetamine use while refusing to allow the State to explore that testimony with Cheever and rebut it with expert testimony." Slip op. at 15.

65

The majority had already cited to *State v. Bowers*, 218 Kan. 736, 737, 545 P.2d 303 (1976), for the proposition that a defendant does not put his or her character in issue by asserting an intoxication defense. Moreover, the plain language of the statute says that the prosecution can admit bad character evidence "only after the accused has introduced evidence of . . . *good character.*" (Emphasis added.) K.S.A. 60-447(b)(ii). Further, the majority fails to explain from whence the State derives a right to a fair trial or by what authority this court can contravene plain statutory language to appease its own sense of fairness.

Where I part company with Justice Luckert is on the determination of harmlessness of the error. In my assessment of harmlessness, I would also consider the manner in which it was presented to the jury.

The majority recognizes the potential jury confusion created by Dr. Welner's first-person narrative. Previously, in the first modern-era death penalty case, this court found that "prosecutors cross the line when they make up an imaginary script that purports to tell the jury what the victim was feeling." *State v. Kleypas*, 272 Kan. 894, 1114, 40 P.3d 139 (2001). The same should be true when the prosecutor presents an expert's imaginary script about what the defendant was thinking.

The majority acknowledges that Dr. Welner implied that he knew what Cheever was actually thinking as the events unfolded without any evidentiary support for such purported knowledge. But inexplicably the majority then summarily declares that the jury was not misled by Dr. Welner's form of communication. That conclusory determination of harmlessness appears to be in conflict with the majority's assessment of the weight and credibility of Dr. Welner's testimony in its original opinion. Back then, the majority declared that Dr. Welner's "'testimony stands out both because of his qualifications . . . and because of the powerful content of his message.' [Citation omitted.]" *State v.*

66

*Cheever*, 295 Kan. 229, 256, 284 P.3d 1007 (2012). I cannot accept that a powerful message from a highly qualified expert delivered in an impermissible imaginary script is harmless, especially given the heightened reliability rule discussed below.

Turning to the jury instructions, I agree with the majority that the trial court erred in failing to follow our long standing rule on how to instruct death-penalty juries about mitigating circumstances. That rule was first clearly enunciated for trial judges in the first *Kleypas* opinion. 272 Kan. at 1078. The part of that rule applicable here provides "that *capital juries in Kansas* must be informed that mitigating circumstances need not be proven beyond a reasonable doubt." (Emphasis added.) *State v. Gleason*, 299 Kan. 1127, 1196-97, 329 P.3d 1102 (2014), *rev'd and remanded sub nom. Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). As the dissent in *Carr* recognized, our reversal in *Gleason* rested in part "on some lower courts' failure to give instructions reflecting the Kansas Supreme Court's 'repeated recognition of the required content'" of the mitigating circumstances jury instruction. 136 S. Ct. at 650 (Sotomayor, J., dissenting). A trial court's refusal to adhere to oft-repeated directions from the Supreme Court on how to instruct a jury constitutes error in any circumstance but most especially in a death penalty case. The majority drops the ball by finding the error harmless.

The majority first goes astray when it assumes the role of a death-penalty jury, "independently review[ing] the complete record on appeal, including the penalty-phase proceedings in full," and then using that review to reweigh the aggravating factors against the mitigating circumstances. Slip op. at 34. For instance, the majority makes its own jury-like finding that "Cheever's mitigating evidence of his potential for rehabilitation was fully countered by the jury's unanimous finding beyond a reasonable doubt that he had a previous felony conviction in which he inflicted great bodily harm." Slip op. at 35. Maybe the jury would have believed that weighting declaration by the majority if the jury had been told that Cheever's potential for rehabilitation did not have to be proved beyond

67

a reasonable doubt. Then, again, maybe not. In other words, Cheever's death sentence is not the product of an informed decision by a jury of his peers. Rather, a majority of this court is responsible for the death sentence in this case.

More importantly, however, I do not believe that the clearly erroneous provision of K.S.A. 22-3414(3) provides an excuse for the majority to don the mantle of super-juror here. That provision states that "[n]o party *may assign as error* the giving or failure to give an instruction," unless that party properly objects in the trial court. (Emphasis added.) K.S.A. 22-3414(3). This, however, is a *death penalty* case, governed by a special set of statutes. One of those provisions says that this court "shall be authorized to notice *unassigned errors* appearing of record if the ends of justice would be served thereby." (Emphasis added.) K.S.A. 2016 Supp. 21-6619(b). At best, it seems counterintuitive to saddle the defendant with a clearly erroneous burden of proof, when the court could conduct a *sua sponte* review of the issue as an unassigned error, with or without an objection to the trial court. At worst, shifting the burden to the defendant runs counter to the heightened scrutiny mandated in death penalty cases.

The majority's review does not appear to take into account that this is a death penalty case subject to heightened scrutiny. But in another recent case, the majority at least gave lip service to the rule that a death penalty appellate review is subject to a heightened reliability standard. *Kleypas*, 305 Kan. at 274. There, we specifically said:

> "A sentence of death is different from any other punishment, and accordingly there is an increased need for reliability in the determination that death is the appropriate sentence. See *Beck*, 447 U.S. at 637-38 (recognizing that a death sentence is a "'different kind of punishment from any other which may be imposed in this country . . . in both its severity and its finality'" [quoting *Gardner v. Florida*, 430 U.S. 349, 357-58, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977)]; court has duty to set aside procedures that undermine the reliability of the jury's determination)." 305 Kan. at 274-75.

68

I submit that permitting the erroneous admission of evidence of the defendant's bad character traits in the State's rebuttal via its expert's unsupported first-person, imaginary script narrative undermines the reliability of the jury's determination to impose the death penalty. Intuitively, one would expect jurors to be more inclined to vote for death if the State successfully portrays the defendant's character to be that of a menace-to-society and incorrigible scofflaw. Likewise, requiring the defendant to prove that the district court's erroneous instruction on mitigating circumstances was the sole reason for the jury's verdict of death denigrates, rather than heightens, the reliability of that verdict. As *Kleypas* related, citing to the United States Supreme Court in *Beck v. Alabama*, 447 U.S. 625, 638, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), we have a duty to set aside such procedures that do not pass the heightened scrutiny standard. 305 Kan. at 275.

I would fulfill my duty, apply the constitutionally required heightened scrutiny standard, and reverse the death penalty in this case based upon the unreliable procedures employed.